UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JESSICA MOORE, | CASE NO. 1:23-CV-01080-DAC |
| Plaintiff, | MAGISTRATE JUDGE DARRELL A. CLAY |
| vs. | **MEMORANDUM OPINION AND ORDER** |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | |
| Defendant. | |

INTRODUCTION

Plaintiff Jessica Moore challenges the Commissioner of Social Security's decision denying disability insurance benefits (DIB). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On May 30, 2023, pursuant to Local Civil Rule 72.2, this matter was referred to me to prepare a Report and Recommendation. (Non-document entry dated May 30, 2023). Following review, and for the reasons stated below, I **AFFIRM** the Commissioner's decision.

PROCEDURAL BACKGROUND

Ms. Moore filed for DIB on July 26, 2021, alleging a disability onset date of June 1, 2020. (Tr. 147). The claim was denied initially and on reconsideration. (Tr. 54-59, 61-67). She then requested a hearing before an Administrative Law Judge. (Tr. 89-90). Ms. Moore (represented by counsel) and a vocational expert (VE) testified before the ALJ on July 18, 2022. (Tr. 34-53). On

1

September 1, 2022, the ALJ issued a written decision finding Ms. Moore not disabled. (Tr. 14-29). The Appeals Council denied Ms. Moore's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; *see* 20 C.F.R. §§ 404.955, 404.981). Ms. Moore timely filed this action on May 30, 2023. (ECF #1).

FACTUAL BACKGROUND

## I.      Personal and Vocational Evidence

Ms. Moore was 25 years old on the alleged onset date, making her a younger individual age 18-49 according to the regulations. (Tr. 27). She completed high school and a four-year degree. (Tr. 27, 37). In the past, she worked as an informal waitress, a fast-food worker, a customer service representative, and as an English as a Second Language (ESL) teacher. (Tr. 27).

## II.     Relevant Medical Evidence

On January 15, 2020, Ms. Moore reported to her primary care physician, Gwen Haas, M.D., , that when she is cold, she has redness, pain, and stiffness in her joints (hands, fingers, hips, knees, feet, and toes), is lethargic, has extreme thirst, and experiences unexplained shortness of breath. (Tr. 288). Dr. Hass observed a multitude of symptoms, including cold intolerance, polyarthralgias, lethargy, extreme thirst, and shortness of breath with some air hunger but no wheezing or cough. (*Id.*). Dr. Hass assessed Ms. Moore with polyarthralgia, cold intolerance, thirst, shortness of breath, and possible Raynaud's phenomenon without gangrene and recommended she schedule her overdue routine medical in the next week or two. (Tr. 289-90).

The same day, Ms. Moore presented to the emergency department with the same complaints, as well as a complaint of abnormal labs drawn earlier that day at her doctor's office. (Tr. 237, 241). Her neurological examination revealed no obvious deficits; she exhibited normal

sensation and strength bilaterally and could ambulate. (Tr. 247). She was diagnosed with dyspnea and joint pain and discharged with instruction to follow up with her primary care physician as an outpatient. (Tr. 250).

Ms. Moore followed up with Dr. Haas on January 21, 2020, who reviewed an elevated D-dimer level but the CT angiogram from the emergency department was negative for pulmonary embolism. (Tr. 284). She continued to complain of dyspnea, temperature intolerance, and fatigue. (*Id.*). After ruling out acute issues such as pulmonary embolism, Dr. Haas referred Ms. Moore to a rheumatologist. (Tr. 286).

Ms. Moore treated with rheumatologist David Mandel, M.D., on July 1, 2020, complaining of using ibuprofen with some regularity due to pain, stiffness, and soreness in her wrists and hands. (Tr. 336). Upon entering the office, her temperature was taken and she had no fever; she also had no extra rheumatic symptoms such as psoriasis, iritis, or colitis. (*Id.*). On examination, she had "very subtle slight synovial thickening over the top of both wrists, particularly the left wrist" but no palpable synovitis of the proximal interphalangeal (PIP) or metacarpophalangeal (MCP) joints, nor signs of flexor tenosynovitis in her hands. (*Id.*). Her pinch and grip were good, she had no effusion of the knees or ankles, and sensation in her hands was intact. (*Id.*). Dr. Mandel assessed her with early onset polyarthritis, inflammatory-type, and arthralgias. (Tr. 337). He sent her for bloodwork including a Vectra DA profile. (*Id.*). The Vectra score was high at 53, indicating an increased risk for radiographic progression; Dr. Mandel recommended adjusting the treatment regimen to reduce inflammation. (Tr. 346).

On July 15, 2020, Ms. Moore followed up with Dr. Mandel to discuss lab results. (Tr. 332). He diagnosed her with seronegative inflammatory arthritis, early onset polyarthritis and arthralgias

3

with multiple joint involvement and marked elevation of acute phase reactant studies. (*Id.*). On examination, Dr. Mandel observed Ms. Moore had tenderness and pain to palpation over both shoulders, "some tenderness" of the left subdeltoid bursa and both wrists, and "slightly decreased" grip and pinch. (Tr. 332-33). Dr. Mandel started Ms. Moore on 300 mg daily Plaquenil. (Tr. 333).

On September 23, 2020, Ms. Moore met with Dr. Mandel for follow up. (Tr. 329). He noted she had started Plaquenil earlier in the summer and was "feeling remarkably better" with less morning pain, stiffness, swelling, and fatigue. (*Id.*). She was continuing to work virtually as an ESL teacher and was engaging in some structured strengthening exercises. (*Id.*). On examination, Dr. Mandel observed "definite reduced swelling over her wrists and knuckles," negative prayer and Tinel signs, no tenderness of the hips or knees, no effusions, and good pinch and grip. (*Id.*). He noted she was on remittive therapy, recommended an annual eye exam while on Plaquenil, and directed her to follow up in four to five months. (Tr. 329-30).

At follow up on December 15, 2020, Ms. Moore reported struggling with constipation the past two to three months, but no melena or diarrhea; Dr. Mandel decided to discontinue Plaquenil for two weeks to assess its effect on Ms. Moore's constipation and recommended she follow up with Dr. Haas and gastroenterology. (Tr. 326-27). Ms. Moore believed the Plaquenil was "quite helpful," and Dr. Mandel noted reduction in acute phase reactant studies. (Tr. 326). On examination, Ms. Moore had minimal swelling and pain over her wrists, flexion and extension of the wrists was slightly limited, no effusion in the knees or ankles, some pain and tenderness over the right hip and right trochanteric bursa, but she exhibited negative Tinel and Phalen signs. (*Id.*).

On February 24, 2021, Ms. Moore met with Dr. Mandel, who noted she had a gastrointestinal workup with no signs of inflammatory bowel disease; she had made some dietary

changes and had not had any abdominal cramping or melena. (Tr. 321). She was no longer working her teaching job. (*Id.*). She had stiffness and soreness in her hands and wrists, and at times had difficulty taking lids off jars and difficulty squeezing and holding materials. (*Id.*). Her RAPID-3 and MD global scores showed a moderate amount of pain. (*Id.*). She had pain to palpation over both hands, diminished strength, painful Tinel sign on the left, and slight tenderness over her hips. (Tr. 321, 323). Laboratory findings supported an underlying inflammatory process. (Tr. 323). She had been using several Aleve and Tylenol each day because of pain; Dr. Mandel discussed restarting Plaquenil and started her on a low dose bridge of prednisone. (*Id.*).

On June 11, 2021, Ms. Moore reported holding off Plaquenil while she was being evaluated for dyspepsia, diarrhea, and constipation; her GI symptoms appeared to have abated. (Tr. 319). On examination, she had no signs of flexor tenosynovitis and had fairly good flexion and extension of the knees but had pain to palpation over her trochanteric and ischial bursae. (*Id.*). Dr. Mandel recommended she follow up for reassessment at the end of the year. (Tr. 320).

A phone message from October 12, 2021, indicated Ms. Moore called Dr. Mandel's office to request a course of prednisone due to a flare in her hands, hips, and feet. (Tr. 322).

On October 26, 2021, Ms. Moore presented to Dr. Mandel for follow up after ongoing pain, swelling, and stiffness in her hands and wrists and, at times, difficulty rising from a chair because of pain and swelling in her feet. (Tr. 302). He noted she had started on a low-dose bridge of prednisone for pain relief. (*Id.*). On examination, she had pain and tenderness over the left shoulder with limited backward and lateral rotation of the shoulder, slight bony enlargement of the distal interphalangeal (DIP) and PIP joints, limited forward bending of the spine, and good grip and pinch. (*Id.*). Logrolling motion of the hips was good, sensation in both feet was intact, but

5

there was marked crepitus to palpation in the left arthritic knee. (Tr. 303). Dr. Mandel noted Ms. Moore would continue using Tylenol, encouraged basic strengthening and conditioning exercises, and noted the possibility of surgery for her left knee. (Tr. 303). Vectra testing was again high and was still at increased risk for radiographic progression. (Tr. 307). Ultrasound revealed a slightly enlarged and thickened supraspinatus tendon but otherwise normal findings; Dr. Mandel administered a corticosteroid injection, reduced because of her history of diabetes. (Tr. 304).

On March 2, 2022, Ms. Moore presented to Dr. Mandel complaining of painful dysthesias in her feet and hands. (Tr. 310). She was pursuing disability. (*Id.*). She reported to Dr. Mandel that perhaps for short periods of time she might be able to lift 10 pounds; she has to take breaks either standing, walking, or sitting but cannot do this on a consistent 8-hour basis; she cannot climb, stoop, crouch, kneel, or crawl; she can rarely or occasionally balance; she can occasionally reach, push, and pull small objects, but fine manipulation was affected by her decreased grip, and gross manipulation might be occasionally affected; heights moving machinery, extreme temperatures, and pulmonary irritants affect her condition; she had not been prescribed a cane, walker, brace, TENs unit, breathing machine, oxygen, or wheelchair; she had moderate to severe pain that impairs her concentration and focus, takes her off-task, and causes absenteeism; she perhaps needed to elevate her legs to about 90 degrees; and she would require additional unscheduled rest periods during an 8-hour workday. (Tr. 310-11). On examination, Ms. Moore had tenderness and soreness over her neck and shoulders, her strength was limited by pain over her upper and lower extremities; she had no rheumatoid nodules over the elbows or knees; light touch with a reflex hammer appeared to provoke numbness and tingling; dorsiflexion of the great toes was slightly impaired; and pulses in hands and feet were intact but grip strength was impaired. (Tr. 311). Dr.

Mandel assessed her with seronegative inflammatory arthritis, multiple joint involvement; polymyalgias with features of fibromyalgia; on remittive therapy with sulfasalazine; and rheumatoid factor, CCP, HLA-B27, and ANA negative. (*Id.*). He recommended she follow up with neurology regarding the dysthesia-type symptoms in her hands and feet and continued her on low-dose sulfasalazine. (*Id.*).

On April 8, 2022, Ms. Moore met with neurologist Joshua Sunshine, M.D., complaining of pins and needles in her hands and feet that wake her up at night, but no weakness. (Tr. 377). She reported tiredness and fatigue, poor appetite, change in bowel movements, neck or back pain, muscle pain, pain/redness/swelling in her joints, numbness or tingling, memory or thinking problems, trouble with walking or balance, anxiety, and hot/cold intolerance; she also admitted problems performing daily activities including driving, dressing, cleaning, and shopping. (*Id.*). On examination, she had normal strength in all extremities and her gait was within normal limits. (Tr. 378). She had reduced pinprick sensation in upper to mid forearms and ankles, reduced vibratory sense bilaterally, and positive Tinel sign. (*Id.*). Dr. Sunshine assessed her with polyneuropathy possibly due to excessive B6 from a supplement; he gave her wrist splints, reviewed blood work, and recommended follow up for an electromyography and nerve conduction study. (*Id.*).

Ms. Moore followed up with Dr. Sunshine on May 26, 2022. (Tr. 393). She reported the wrist splints helped and having a pain scale of four out of ten. (*Id.*). On examination, she had normal strength in all extremities and her gait was within normal limits. (Tr. 393-94). She had reduced pinprick sensation in upper to mid forearms and ankles, reduced vibratory sense bilaterally, and positive Tinel sign. (Tr. 393). Dr. Sunshine updated his assessment as "numbness"

and recommended proceeding with an MRI to make sure it was not coming from her neck due to her history of rheumatoid arthritis. (Tr. 394).

On June 20, 2022, Ms. Moore followed up with Dr. Mandel, and reported making some significant accommodations in her lifestyle including exercise, work, and caring for her son. (Tr. 410). She had noticed definite improvement in muscle pain, fatigue, and joint stiffness, but still had some joint swelling in her shoulders, hands, and wrists in the morning, and at times had difficulty gripping, squeezing, and holding materials. (*Id.*). On examination, she had tender areas over her shoulders, hands, and wrists, puffiness about her knuckles, and fairly good pinch and grip. (*Id.*). Ms. Moore mentioned that possibly the sulfasalazine may be exacerbating her symptoms of early satiety and Dr. Mandel recommended she follow up with gastroenterology. (Tr. 411).

## III.    Medical Opinions

At the initial level, agency reviewing physician James Cacchillo, M.D., reviewed Ms. Moore's medical records on September 15, 2021. (Tr. 54-58). Dr. Cacchillo concluded that Ms. Moore's impairments did not meet or medically equal Listing 14.09 (inflammatory arthritis). (Tr. 56). He opined Ms. Moore was limited to light work with further restrictions, including that she could never climb ladders, ropes, or scaffolds; occasionally crawl; and frequently climb ramps and stairs, stoop, kneel, and crouch and must avoid all exposure to hazards such as heavy machinery and unprotected heights. (Tr. 56-57).

At the reconsideration level, Lynn Torello, M.D., reviewed the record on December 14, 2021, and affirmed Dr. Cacchillo's finding that Ms. Moore's impairments did not meet or medically equal Listing 14.09. (Tr. 61-63). Dr. Torrello modified the residual functional capacity (RFC) to include occasional crouching but otherwise affirmed Dr. Cacchillo's findings. (Tr. 63-65).

On March 14, 2022, Dr. Mandel completed a physical capacity medical source statement opining Ms. Moore's lifting/carrying, standing/walking, and sitting would be affected by her impairment. (Tr. 308). He stated she could possibly lift/carry 10 lbs. (*Id.*). With respect to standing/walking, he indicated she needs to take a break every 15 minutes. (*Id.*). He opined she could never climb, balance, stoop, crouch, kneel, or crawl, perform fine or gross manipulation, and only occasionally reach or push/pull, and supported these limitations by stating "uncomfort" and "tie shoes." (Tr. 308-09). He indicated environmental restrictions affecting the impairment included heights, moving machinery, temperature extremes, and pulmonary irritants. (Tr. 309). She had not been prescribed any assistive device, brace, or TENS unit. (*Id.*). She had severe pain that would interfere with concentration, take her off task, and cause absenteeism. (*Id.*). She would need to elevate her legs to 90 degrees at will and alternate between sitting, standing, and walking, and take additional unscheduled rest periods. (*Id.*).

## IV.    Administrative Hearing

Ms. Moore testified that she was 27 years old, completed high school, and received a four-year college degree in English. (Tr. 37). She worked as a barista, a waitress, and a customer service representative for a newspaper company, had been self-employed, and last worked as an ESL teacher. (Tr. 37-38). The ESL teacher position was remote; she worked from home via a computer video chat program to teach English to children overseas. (Tr. 38).

Ms. Moore stopped working on June 1, 2020; she was unable to hold a consistent schedule or complete her job requirements due to fatigue and pain in her hands, fingers, wrists, hips, and feet. (Tr. 39). She described that even though her ESL teaching position was the easiest on her

body, she still was unable to work without needing excessive breaks, or needing to sit/stand, or pain interfering with her typing. (Tr. 39-40).

Her days vary depending on her pain levels. (Tr. 40). On a good day, she awakens and does chores around the house including laundry, dishes, cleaning, dusting, and caring for her four-year-old son. (*Id.*). She can usually play with her son while sitting in a reclining chair or laying in bed and do activities like coloring, watching videos, or singing. (*Id.*). Her boyfriend, her son's father, also lives with them and helps care for their son. (Tr. 41).

Ms. Moore testified she had not found a medication that consistently manages her flares. (*Id.*). She recently started sulfasalazine, which has reduced her flares to about once per month or once every couple of months. (*Id.*). This medication causes some nausea, and she limits her meals as a result. (Tr. 47-48). She also manages her diet and activities to avoid flares. (Tr. 41). She avoids red meat and processed/fried foods. (Tr. 42). She also does stretching and strengthening exercises such as yoga at home twice per week. (Tr. 41-42). She found that if she does yoga more frequently, it causes soreness and fatigue. (Tr. 42). She limits activities such as standing and walking to no longer than 30 minutes at a time. (Tr. 43). She used to lift weights but cannot do that any longer. (*Id.*). If her hands are sore on a particular day, she will avoid doing dishes or typing, and she will rest a book on a stand so the weight is not in her fingers. (*Id.*). She will recline or lay down with her feet above her chest as much as possible during the day to reduce pressure on her feet and hips. (Tr. 43-44). Even when she is careful, her hands will swell about once or twice per week. (Tr. 44). She does not have difficulty getting dressed or bathed because she has modified her routines: she will take baths instead of showers to avoid standing, and she wears clothes that are easy to put on, such as slip-on shoes, or with no ties, snaps, or buttons. (Tr. 46). She avoids typing on the

computer and uses voice-to-text instead. (Tr. 47). She has stopped hobbies such as weightlifting, knitting, crocheting, and journaling because they cause pain. (*Id.*). She only sleeps for three or four hours at a time before waking to walk around and relieve pressure on her hips. (*Id.*).

The VE described Ms. Moore's past work as informal waitress, fast-food worker, customer service representative, and ESL teacher. (Tr. 48). The VE testified that a hypothetical individual of the same age, education, and work background as Ms. Moore, who can perform work consistent with a light exertional level, but can never climb ladders, ropes, or scaffolds; frequently climb ramps and stairs; frequently stoop and kneel; and occasionally crouch and crawl; can reach frequently in all planes, including overhead and she can handle, finger, and feel with both hands frequently; who must avoid exposure to high concentration of cold temperatures, and who can have no exposure to unprotected heights or dangerous machinery, could perform Ms. Moore's past work as generally and actually performed. (Tr. 49). However, even assuming there was no past work, the individual could perform representative jobs of cashier, sales attendant, and office helper. (Tr. 49-50). If that individual were further limited to standing/walking four hours out of every eight, that person could still perform the customer service representative position as generally performed and the ESL teacher as actually performed. (Tr. 50). The VE also testified that the jobs of cashier and marker would be available to a person so limited, but with job numbers reduced by 50% to accommodate an increased sit/stand interval. (Tr. 50-51). But if the individual needed to elevate her legs to waist level at will, it would cause off-task behavior and preclude all work. (Tr. 51-52). Employers tolerate no more than 10% off-task behavior or more than one absence per month. (Tr. 52).

STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## THE ALJ'S DECISION

At Step One, the ALJ determined Ms. Moore had not engaged in substantial gainful activity since June 1, 2020, the alleged onset date. (Tr. 19). At Step Two, the ALJ identified rheumatoid arthritis as a severe impairment. (Tr. 19-20). The ALJ also considered neuropathy and diabetes but found neither was a severe impairment. (Tr. 20). The neuropathy was not considered a severe impairment because Ms. Moore had not received a definitive diagnosis of neuropathy and the symptoms had not persisted for a full 12 months; additionally, some symptoms may be attributable to rheumatoid arthritis and were considered when making additional findings. (*Id.*). As for diabetes, laboratory testing was not consistent with a finding of diabetes and Ms. Moore was not receiving treatment for diabetes; thus, the ALJ determined it was not a medically determinable severe impairment. (*Id.*).

At Step Three, the ALJ determined Ms. Moore's rheumatoid arthritis did not meet or medically equal the severity of a listed impairment. (Tr. 20-21). Specifically, the ALJ considered Listing 14.09 and found that, despite Ms. Moore's complaints of pain, fatigue, and other functional restrictions, such limitations were no more than moderate and did not meet Listing-level severity. (*Id.*).

Before proceeding to Step Four, the ALJ reviewed the medical records, function reports, administrative hearing testimony, and medical opinions to determine Ms. Moore has the RFC

> to perform light work as defined in 20 CFR 404.1567(b) except she can: never climb ladders, ropes, or scaffolds; frequently climb ramps and stairs; frequently stoop and kneel; and occasionally crouch and crawl. She can reach frequently in all planes, including overhead and she can handle, finger, and feel with both hands frequently. She must avoid exposure to high concentration of cold temperatures. She can have no exposure to unprotected heights or dangerous machinery.

13

(Tr. 21). At Step Four, the ALJ determined Ms. Moore has past relevant work as an informal waitress, fast-food worker, customer service representative, and ESL teacher. (Tr. 27).

At Step Five, the ALJ concluded Ms. Moore could perform all her past relevant work and jobs exist in significant numbers in the national economy that Ms. Moore can perform, including cashier, sales attendant, and office helper. (Tr. 27-28).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence de novo, make credibility determinations, or

weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision is supported by substantial evidence, the Court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); accord *Shrader v. Astrue*, No. 11 13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

DISCUSSION

Ms. Moore brings three issues for review:

1.   Whether the ALJ failed to conduct a proper Step Three analysis to evaluate if her inflammatory arthritis met Listing 14.09(A);

2.   Whether the ALJ failed to conduct a Step Three analysis of Ms. Moore's neuropathic condition; and

3.   Whether the ALJ erred in evaluating Dr. Mandel's opinion evidence.

(ECF #9, PageID 443). I address each in turn below, but find that none warrant remand.

**I.      The ALJ's evaluation of Listing 14.09(A) was proper.**

Ms. Moore first argues the ALJ failed to properly conduct a Step Three Listings analysis for her inflammatory arthritis. (ECF #9, PageID 454-58). She argues the ALJ's explanation was limited, and that he "cherry-picked" the evidence to use "self-care" activities as his reasoning to find her not disabled; this, in her view, does not demonstrate she can perform work-related activities. (*Id.*). In response, the Commissioner asserts the ALJ considered evidence, including activities of daily living, such as "taking care of personal hygiene," weighed the evidence in favor of and against a finding of disability, and ultimately determined Ms. Moore was not disabled. (ECF #11, PageID 477-82). As such, his decision was supported by substantial evidence and not subject to remand by this Court. (*Id.*).

At Step Three, a claimant will be found disabled if her impairment meets or equals one of the listed impairments. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010). The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Commissioner considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or

16

work experience." 20 C.F.R. § 404.1525(a). As such, a claimant who meets or equals the

requirements of a listed impairment will be deemed conclusively disabled and entitled to benefits.

*Id.* The claimant must establish that claimed impairments meet or are medically equivalent to a

listed impairment. *See, e.g., Lett v. Colvin*, No. 1:13 CV 2517, 2015 WL 853425, at *15 (N.D. Ohio

Feb. 26, 2015). An ALJ will find that an impairment is "medically equivalent to a listed

impairment . . . if it is at least equal in severity and duration to the criteria of any listed

impairment." 20 C.F.R. § 404.1526(a). The ALJ must consider all evidence in the case record

about the impairment(s) and its effects on the claimant that is relevant to the finding of medical

equivalence. 20 C.F.R. § 404.1526(c). At Step Three, Ms. Moore retains the burden of proof to

demonstrate she meets all requirements of the applicable Listing. *See Walters*, 127 F.3d at 529.

The requirements for Listing 14.09(A)[1] are as follows:

**14.09  Inflammatory arthritis.** With:

A.  Persistent inflammation or persistent deformity of:

1.  One or more major peripheral joints in a lower extremity and medical documentation of at least one of the following:

A documented medical need for a walker, bilateral canes, or bilateral crutches or a wheeled and seated mobility device involving the use of both hands; or

An inability to use one upper extremity to independently initiate, sustain, and complete work-related activities involving fine and gross movements and a documented medical need for a one-handed, hand-held assistive device that requires the use of the other upper extremity or a wheeled and seated mobility device involving the use of one hand; or

---

[1]  Ms. Moore argues only that she meets the requirements of Listing 14.09(A). (ECF #9, PageID 455-56). I therefore limit my discussion here to the same and deem all other arguments waived. *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997).

    2.     One or more major peripheral joints in each upper extremity and medical documentation of an inability to use both upper extremities to the extent that neither can be used to independently initiate, sustain, and complete work-related activities involving fine and gross movements.

20 C.F.R. Pt. 404, Subpt P. App. 1, § 14.09(A).

Here, substantial evidence establishes that Ms. Moore does not meet subpart 1 of Listing 14.09(A) because she has not shown a documented medical need for a walker, bilateral canes, or bilateral crutches or a wheeled and seated mobility device involving the use of both hands, or a need for a one-handed, hand-held assistive device coupled with the inability to complete fine and gross movements with the other hand. (*See* Tr. 309) (opinion of Dr. Mandel indicating Ms. Moore required no cane, walker, or brace). As to subpart 2, substantial evidence likewise establishes Ms. Moore does not meet all Listing requirements. As the ALJ analyzes:

> Listing 14.09A requires objective evidence of persistent inflammation or persistent deformity of one or more major peripheral joints in a lower extremity, and medical documentation of . . . (2) an inability to use one upper extremity to independently initiate, sustain and complete work-related activities involving fine and gross movements and documented medical need for use of a one-handed, hand-held assistive device that requires the use of the other upper extremity or a wheeled and seated mobility device involving the use of one hand. In the case of an individual who has persistent inflammation or deformity of one or more major peripheral joints in both upper extremities, this listing may be met if there is medical documentation of an inability to use both upper extremities to the extent that neither can be used to independently initiate, sustain, and complete work- related activities involving fine and gross movements.

> The record does not establish that the claimant has this level of functional restriction in ambulation or performing motor movements. treatment records show that she complains about sometimes having difficulty performing activities such as opening jars or maintaining her grasp on objects. But there is no indication that she is unable to perform self-care activities, nor that any physician has prescribed the use of an ambulation device of any kind.

(Tr. 20). As with Listing 14.09(A)(1), Ms. Moore has not demonstrated she meets the requirements of Listing 14.09(A)(2) or that the ALJ did not properly evaluate the evidence.

The ALJ noted Ms. Moore complained of difficulty performing activities such as opening jars or maintaining her grasp. (Tr. 20). But looking to the opinion as a whole, the ALJ also considered that Ms. Moore "reported 'definite improvement' in muscle pain, fatigue, and joint stiffness" when considering the other relevant subsections of Listing 14.09. (Tr. 21). He also considered her fine and gross motor movements in her upper extremities at the RFC level, limiting her to reaching frequently in all planes, and frequent handling, fingering, and feeling in both hands. (Id.). He supported the RFC findings by considering evidence such as:

- On days when her hands hurt, she avoids doing dishes, typing, and holding books in her hands. (Tr. 22).

- At her annual physical examination with Dr. Haas on January 28, 2020, physical examination documented no joint redness or swelling, no joint abnormalities, and normal reflexes and sensation. (Id.).

- Physical examination notes document . . . "very subtle" slight synovial thickening over the top of both wrists, greater on the left, without palpable synovitis of the PIP or MCP joints, no signs of flexor tenosynovitis, good pinch and grip strength. (Id.).

- On February 24, 2021, the claimant reported that after stopping Plaquenil, she had developed more stiffness and soreness in her hands and wrists. She said she was having difficulty with functional activities such as taking the lids off jars or squeezing and holding materials. She also experienced pain to palpation over both hands and wrists and Dr. Mandel observed diminished strength in the bilateral upper extremities. (Tr. 23).

- On June 11, 2021, the claimant returned to see Dr Mandel, who found her to have good strength in her upper extremities. (Id.).

This analysis evinces that the ALJ was not selective in his choice of evidence and did not cherry-pick the record to reach a finding of non-disability, nor did he focus on self-care activities to

"ignore[] a wealth of evidence in the record that supports a finding that Ms. Moore **was** significantly limited in her ability to perform fine and gross movements." (ECF #9, PageID 456). Instead, the ALJ considered available evidence in the record both for and against a finding of disability. He considered her subjective statements of her condition, such as inability to grip objects, along with limitations in her ability to perform work-related activity such as typing. He also considered the waxing and waning of her symptoms and her providers' observations of the same.

Ms. Moore has not met her Step Three burden to demonstrate she meets all requirements of Listing 14.09(A). I find the ALJ's decision in this regard supported by substantial evidence and thus to remand on this issue.

## II.  The ALJ did not err in his evaluation of Ms. Moore's neuropathic condition.

Ms. Moore argues the ALJ failed to evaluate Ms. Moore's neuropathic condition against the relevant Listings at Step Three. (ECF #9, PageID 458-61). She states "[r]ecent evidence from neurologist [Dr.] Sunshine confirmed that Ms. Moore has polyneuropathy of her hands and feet, in addition to the inflammatory arthritis discussed above. The ALJ failed to conduct *any* Step Three analysis of Listing 11.14 (Peripheral Neuropathy), to determine whether Ms. Moore's neuropathic condition met or equaled this listing." (*Id.* at PageID 458) (internal citations omitted). She then points to Dr. Sunshine's findings of decreased pinprick sensations in Ms. Moore's arms and ankles, positive Tinel sign, and reduced vibratory sensation and mild neck ache, and her own testimony of limitations in her activities of daily living to support that she met or equaled Listing 11.14. (*Id.* at PageID 460-61). The Commissioner responds that Ms. Moore forfeited the right to argue she met Listing 11.14 by not raising the issue at the hearing before the ALJ and because the

evidence presented does not raise a substantial question as to whether she met or equaled that Listing. (ECF #11, PageID 482-85).

Social Security regulations require an ALJ to find a claimant disabled if the person meets a listing. 20 C.F.R. § 404.1520(a)(4)(iii); *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). Neither the Listings nor Sixth Circuit jurisprudence require the ALJ to "address every listing" or "discuss listings that the applicant clearly does not meet," but the ALJ should discuss the relevant listing where the record "raises a substantial question as to whether [the claimant] could qualify as disabled" under a listing. *Sheeks v. Comm'r of Soc. Sec.*, 544 F. App'x 639, 641 (6th Cir. 2013) (citations omitted). Where the ALJ's decision does not discuss a listing subsequently raised in objection, the court "must determine whether the record evidence raises a substantial question as to [the claimant's] ability to satisfy each requirement of the listing." *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 433 (6th Cir. 2014).

Ms. Moore must do more than point to some evidence on which the ALJ could have based his finding to raise a "substantial question" as to whether she has satisfied a listing. *Sheeks*, 544 F. App'x at 641-42 (finding that claimant did not raise a substantial question as to satisfying the listing for intellectual disability where the ALJ's finding of borderline intellectual functioning simply left open the question of whether he meets a Listing and where claimant pointed to only a few pieces of tenuous evidence addressing the Listing). To raise a "substantial question," the claimant "must point to specific evidence that demonstrates [she] reasonably could meet every requirement of the listing . . . . Absent such evidence, the ALJ does not commit reversible error by failing to evaluate a listing at Step Three." *Id.* at 432-33. "If a substantial question is raised, then it cannot be harmless error since the claimant could have been found disabled." *Smith-Johnson*, 579 F.

App'x at 433 n.5. But without such evidence, the ALJ does not commit reversible error by failing to evaluate a listing at Step Three; reversal is not warranted when the ALJ's Step Three conclusion is sufficiently supported by factual findings elsewhere in the decision. *Forrest v. Comm'r of Soc. Sec.,* 591 F. App'x 359, 366 (6th Cir. 2014).

Here, the ALJ determined at Step Two that Ms. Moore's polyneuropathy was not a severe impairment:

> Recent treatment records from Dr. Mandel, the claimant's rheumatologist show that he referred her to a neurologist [Dr. Sunshine] for evaluation of dysesthesias in her extremities, which the claimant described as tingling or a pins-and-needles sensation. Although an EMG and MRI were ordered by the neurologist, the claimant has not received a definitive diagnosis of neuropathy. Additionally, these symptoms have not persisted for a full 12 months. These symptoms may be attributable to the claimant's rheumatoid arthritis but have not been shown to be a symptom of another medically determinable impairment. Therefore, these symptoms were considered when making the findings below.

(Tr. 20). The ALJ does not appear to have mischaracterized Dr. Sunshine's findings in this Step Two assessment. (*Compare id. with* Tr. 377-78 *and* Tr. 393-94).

Ms. Moore first saw Dr. Sunshine on April 8, 2022, just short of five months before the ALJ issued his decision. (Tr. 29, 377). At this first visit, Dr. Sunshine assessed her with polyneuropathy, but also surmised her symptoms may be related to excessive B6 from a gummy supplement she was taking at the time. (Tr. 378). When she returned to Dr. Sunshine on May 26, 2022, he updated his assessment to remove the polyneuropathy diagnosis in favor of a diagnosis of numbness. (Tr. 394). He also noted some reservations as to whether the symptoms were independent or if they were related to her rheumatoid arthritis. (*See id.*). He recommended proceeding with an MRI to further clarify whether her symptoms stemmed from rheumatoid arthritis. (*Id.*).

22

Absent a definitive diagnosis of polyneuropathy resulting in a finding of a non-severe impairment at Step Two, Ms. Moore cannot show she meets the requirements of Listing 11.14(A) at Step Three, or even raise a "substantial question" that she meets the same. *Sheeks*, 544 F. App'x at 641-42. Thus, the ALJ did not err by failing to address Listing 11.14 in his Step Three analysis. I decline to remand on this basis.

### III.     The ALJ did not err in his evaluation of Dr. Mandel's medical opinion.

Finally, Ms. Moore argues the ALJ improperly weighed Dr. Mandel's opinion and subjected it to greater scrutiny than the regulations require. (ECF #9, PageID 461-64). She takes issue with the ALJ rejecting Dr. Mandel's opinion because it was based on her subjective symptom statements and argues the ALJ's analysis was conclusory and do not provide her or this Court with the ability to understand his reasoning. (*Id.* at PageID 463-64). The Commissioner opposes, stating the ALJ properly articulated his consideration of Dr. Mandel's opinion and of the other opinions in the record. (ECF # 11, PageID 485-88).

In determining the persuasiveness of a medical opinion, the ALJ considers five factors: (1) supportability; (2) consistency; (3) relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors that tend to support or contradict a medical opinion. 20 C.F.R. § 404.1520c(c)(1)-(5). The most important factors the ALJ must consider are supportability and consistency. 20 C.F.R. § 404.1520c(b)(2). With respect to supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical opinions . . . will be." 20 C.F.R. § 404.1520c(c)(1). Similarly, "[t]he more consistent a medical opinion(s) . . .

is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . ." 20 C.F.R. § 404.1520c(c)(2).

The ALJ must "explain how [he] considered the supportability and consistency factors for a medical source's medical opinions" in the written decision. 20 C.F.R. § 404.1520c(b)(2). Conversely, the ALJ "may, but [is] not required to, explain" how he considered the relationship, specialization, and other factors set forth in paragraphs (c)(3) through (c)(5) of the regulation. *Id.* When two or more medical opinions about the same issue are equally well-supported and consistent with the record, but are not exactly the same, the ALJ must "articulate how [he] considered the other most persuasive factors" of relationship, specialization, and other factors set forth in paragraphs (c)(3) through (c)(5) of the regulation. 20 C.F.R. § 404.1520c(b)(3).

Here, the ALJ analyzed Dr. Mandel's opinion as follows:

The claimant's rheumatologist, David R. Mandel, M.D., provided an opinion on March 14, 2022 regarding the limitations imposed by the claimant's rheumatoid arthritis, on a form entitled "Medical Source Statement: Patient's Physical Capacity." Dr. Mandel offered the opinion that the claimant is limited to lifting 10 pounds occasionally and needs to take breaks from standing and walking. He also said that her ability to sit is affected by her impairment but did not provide any type of time limit. He said that the claimant should never climb, balance, stoop, crouch, kneel, or crawl; never perform fine or gross manipulation; and occasionally reach, and push/pull. He said that the claimant should avoid moving machinery, temperature extremes, and pulmonary irritants. He further opined that the claimant experienced severe pain that interferes with her concentration, takes her off-task, and would cause absenteeism. Dr. Mandel also said that the claimant needs to be able to elevate her legs at will and requires unscheduled rest periods in addition to the standard breaks usually provided by employers.

In support of his opinion, Dr. Mandel submitted his office visit notes from an appointment on March 2, 2022. The notes for this appointment make clear that he reviewed the form described above with her and asked her questions to assess how much she would be able to perform the activities. For example, he asked her if lifting and carrying are affected by her impairment and she replied that she would be able to lift up to 10 pounds of weight for short periods of time. He also said that she would have to take a break when sitting or walking. The fact that Dr. Mandel

relied on the claimant's responses to his questions in completing the form renders it less than persuasive.

Additionally, although Dr. Mandel has regularly treated the claimant, his physical examination notes from this and other appointments fail to provide objective support for such a great degree of limitation. For instance, at the appointment where he went over the form with her, his physical examination referred to her as having impaired grip strength, and strength limited by pain in her upper and lower extremities. However, he does not provide any documentation of strength testing, nor identify the degree of limitation in these functions. He offered no justification or support for the recommendation that she should elevate her legs. Finally, limiting the claimant to performing no postural activities or fine and gross manipulation is wholly inconsistent with the claimant's reported independence in performance of ADLs and some household chores. The muscular ultrasound indicates moderate inflammatory arthritis.

(Tr. 25-26) (cleaned up).

My review confirms the ALJ followed the regulations when articulating his analysis of Dr. Mandel's medical opinion. He articulates his consideration of the evidence in terms of "supportability" by noting that the main support for Dr. Mandel's opinion was his March 2, 2022 examination. (Tr. 25). Comparing that visit with the opinion evidence, it is apparent that Dr. Mandel reviewed the form with Ms. Moore present. (*Compare* Tr. 310-11 ("She has gone forward applying for disability. We spent some time reviewing her questionnaire form about this.") *with* Tr. 308-09). Merely transposing a claimant's subjective symptom statements does not transform them into a medical opinion, *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804 (6th Cir. 2011), and it was appropriate for the ALJ to acknowledge this lack of support in his reasoning for the persuasiveness of Dr. Mandel's opinion. The ALJ also articulated the lack of support found elsewhere in Dr. Mandel's treatment notes, and the failure to provide objective testing in support of his opined limitations. (Tr. 26). He also articulated the inconsistency of Dr. Mandel's opinion with Ms. Moore's own reports of independence in her activities of daily living and in some of her

household chores. (*Id.*). The ALJ articulated his findings in the required terms of supportability and consistency; consequently, there is no error requiring remand. Ms. Moore's argument otherwise amounts to a request to reweigh the evidence, which I may not do. I therefore decline to remand on this basis.

### Conclusion

Following review of the arguments presented, the record, and the applicable law, I **AFFIRM** the Commissioner's decision denying disability insurance benefits.

Dated: April 9, 2024

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE